is Lee v. Virginia State Board of Elections. And Mr. Spiva, I guess we're going to hear from you first. Whenever you're ready, take your time, but not too much. Opposing counsel appears to have you outnumbered. Yes, yes, definitely. Good morning, Your Honors. My name is Bruce Spiva from Perkins Coie, and I represent the plaintiffs in this action and the appellants. I'd like to reserve five minutes of my time for rebuttal. If I may. Your Honors, we've briefed all of the issues. I'm going to try to focus my argument on the Voting Rights Act, the so-called Anderson Verdict claim, and the intentional discrimination claim, although I'm obviously prepared, and would like to answer any questions Your Honors have about any of the claims. Just a framework that I think is helpful in determining whether the district court erred in the case, and whether the District Court erred in the case, and whether the Supreme Court erred in the case. Legally and factually, I think this framework runs really throughout all the claims. And that is that Virginia had a non-photo ID law from the 1990s up through 2012. It was not a strict ID law. It allowed someone to come to the polls, and if they didn't have one of the qualifying IDs, to sign an affirmation of identity and vote a regular ballot. The record, I think, reflects, and there's no evidence to the contrary, that there was no evidence of in-person voter impersonation fraud under that regime, and that the state's interests were served. Nonetheless, in 2012, Virginia passed a strict non-photo ID, which has been called so-called SB1, which permitted a non-photo ID. It allowed a range of IDs, non-photo IDs, including things like bank statements and utility bills and the like, as well as photo IDs. And that was passed in May of 2012. And the Governor's Office touted it as a huge success, that it served the Commonwealth's interest in preventing fraud. Let me ask you this. Do you think a photo ID law is automatically invalid? No, Your Honor. I would not say that it's automatically invalid. Do you think there's a different test for reviewing the photo ID law in jurisdictions that were formally covered by Section 5, as contrasted with jurisdictions that were never covered by Section 5, or the Voting Rights Act? Right, yes. I don't think there's a separate test, Your Honor. I don't think a photo ID law or whatever the voting regulation that the Court is Does history create a presumption against a photo ID law, in your opinion, in formally covered jurisdictions? I don't think it creates a presumption against it, Your Honor. I think under the Voting Rights Act Does it make it a tougher burden on the State? I think it is certainly a very big and weighty factor that the Court needs to evaluate in the totality of the circumstances to see whether the photo ID law, when we're talking about the Voting Rights Act claim, whether that interacts with certain historical and socioeconomic factors to impact, to lessen, abridge What's the least amount of change to this statute that would make it legal, in your estimation? I think this statute should be stricken in its entirety, Your Honor, because I know that, but I'm asking. There's no amount of change they could do. They couldn't take out one provision or change one accommodation at all. Well, the problem is this was passed week in 10, and I think the evidence in the record is clear with the intent to discriminate against minorities and young people and therefore violates the Constitution. Sure. I'm just trying to get your position. You understand. Sure. Is there any incremental change to the statute that the State could effect that you think would bring it results-wise? I'm leaving your intentional argument aside. Do you understand? Sure. To bring it into being comporting with the law? Well, Your Honor, I'm putting the intent claims to one side. If we're just focusing on the Voting Rights Act. Forget the intent for a second. But that intent, your argument would have to be, leads to some provision that results in. And as you said, they're motivated to get to those results. Right. I'm kind of listing that standard just a little bit and going. You think something about that act results in making it harder for minority voters to participate in elections. Could they change anything about it to make it either by deleting or adding? What's the smallest change? I'm trying to figure out exactly, when it's all said and done, what we're arguing about in this case. Right. Yes, I sure do. And I don't want you to think I'm evading the question. I'm going to answer it directly. I don't think you're evading it. But I do think whatever the change they made, it would need to be looked at in the totality of the circumstances. That said, they had a law for umpteen years. So I got that. But I'm saying what they added on top of that law. How would you change that or modify that to make it acceptable results-wise? Right. And I'm getting to that, Your Honor, because what they added was nothing of substance. The law in 2013 differed from the law in 2011 and 2012 in this respect. Previously, you could go to the polls, you could sign an affirmation of identity if you couldn't get that card because of these various factors that made it harder to have one, and you could still vote a regular ballot. But the 2013 law, the photo ID law, the strict photo ID law, says, no, you can't do that anymore. You can get a free ID. But to get the free ID, you have to go to a registrar's office, which is sometimes, very frequently, we put up- I got all that. But what if they just, what if the state of Virginia, I'm just asking all the Commonwealth, what if they sent a voter, they sent an ID, photo ID to every voter in the state? Would then that be satisfactory? Well, that would be a lot more similar to what they did with the 2012. Would that be satisfactory? It might be. They made available, sent to every voter an ID card. That would count. Can I just say one more thing about going to the registrar's office? Because how do you get that free ID? I got your point on that. You sign the affidavit of identity. Your point is you go in there and you don't have an ID to prove who you are to get the ID. That's right. So that's the only thing that's changed is a hurdle in the way, basically, with no real justification. To answer Your Honor's question, though, on what if they sent an ID to everybody in the state? Well, that's kind of what they did with the 2012 law. They sent a voter registration. Well, they didn't send it to everybody in the state. I need to back up. They sent it to every registered voter in the state, a registration card that could be used as an ID and to vote a regular ballot. I'm trying to meld the two ideas, the photo ID and no discriminatory result. I'm trying to meld the two ideas to understand your argument. You understand it's fine to say we don't like it. We've got to go, but they're going to get up and guess what they're going to say. It's fine. I'm trying to figure out exactly where do we really get into the point of contention. That would be better, Your Honor. The problem is there's lots of evidence that a strict photo ID law deters a lot of people from registering in the first place. I thought you said in the beginning that a photo ID law was not per se problematical. I would not say that it's per se problematical, Your Honor. What your argument is now is the photo ID requirement has a different burden on different classes of people and therefore is inappropriate. And that doesn't quite square with your opening statement to Judge Shedd. Well, the way I would reconcile that, Your Honor, because I think they're consistent, and that is that for each voting regulation, here we're talking about photo ID, you have to look at the circumstances, the totality of the circumstances in the state. You have to look at the impact in that state. And again, I'm still putting aside intent. Well, if you require everybody to have a photo ID throughout the nation, it's going to have a little different impact on everybody. I mean, how do you get the photo ID? Are you working? You do this. But I thought you said that's okay. I didn't say it's okay. I said that would be a lot better. Is that illegal? If everybody in the nation had a photo ID? Not had one, had to have one to vote. Would that be illegal? I would think so, Your Honor, but it would have to be evaluated based on its impact in the relevant jurisdiction. That's what I think the jingles. Why is it illegal? Why is it discriminatory to say everybody who votes has to present a photo ID, period? Well, first of all, it's been shown that minorities, and particularly in Virginia, but it's also been shown in other areas as well, that minorities tend to have photo IDs at a much lower rate than non-minorities. Same with young people. And so that would have a discriminatory impact. Often, in many states, that interacts with these jingles factors, Senate factors, in a way that makes it more difficult for minorities to vote. That's why I asked about the Section 5 distinction, because there's nothing constitutionally invalid about a photo ID per se, is there? Just per se. I would not say per se, no. But then you say, well, you have to see how it impacts, and it impacts on certain people in certain jurisdictions, certain areas. Well, isn't that almost coterminous with Section 5, basically? It's not coterminous, but there's certainly overlap. It's very close. They both use the word abridged, right? I mean the areas covered, and the reason the areas were ostensibly covered under Section 5, plus the reasons that photo IDs are not allowed. Isn't that the same? I just tried a case in Wisconsin, Your Honor, which was never covered under Section 5, and we have a challenge to the photo ID law. The law is different in the Seventh Circuit, and I certainly don't advocate that the Fourth Circuit changed their law. In part, yes. There are more issues than just the photo ID. Your Honor, I'm happy to answer more questions right now, or I might reserve for rebuttal. Sure, if you wish. Let me ask this. Have they joined in this suit? No. Okay, thank you. One other question, please, before you sit down. When the legislature passed the statute that you challenged now, was it subject to any challenge by the Department of Justice when it was enacted? No. No, because, well, I'm sorry. Shelby County, the Supreme Court accepted cert in Shelby County before it was enacted. Shelby County was decided after it was enacted, but it was never pre-cleared. It never had to go through pre-clearance. That's correct. It had no authority to take action other than to bring its own lawsuit, and, of course, there's prosecutorial discretion involved there. But it no longer had pre-clearance authority. They could have joined this suit, couldn't they? They could have, yes. But had they had pre-clearance authority, my guess is they would have done what they did in Texas when they still had pre-clearance authority and they would have denied it. That's not the record. That is something Your Honors can take judicial notice of. The South Carolina statute is very different because it has an affidavit of reasonable impediment, which allows you to vote a regular ballot. I understand everybody can vote in this case, can show up without anything and vote, and then must, it's provisional, and then must get, within three days, get an ID that's provided free without the provision of further documentation. The critical difference, though, Your Honor, is that it is a provisional ballot. It is not a regular ballot. Well, I understand, but then the ID is given out free and all you have to do is orally give some information and that legitimizes that. There's lots of evidence in the record, Your Honor, though, that all you have to do to get the free ID is actually quite burdensome for a lot of people, particularly for minorities and for young people. All right. Mr. Hearn. Thank you, Your Honor. May it please the Court, I'm Thor Hearn for the Commonwealth. The findings that Judge Hudson made found that this did not, in fact, prevent the Virginia's photo ID law, viewed in its totality, did not prevent any individual from an opportunity to vote, not a single person. Do you think the District Court should revisit this in light of our North Carolina case, the North Carolina NAACP versus McCrory? There was a lot of fact-finding in that case, and the Court doesn't particularly take issue with the fact-findings. In other words, is there a possibility in this case that the District Court missed the forest for the trees, and should we give him the opportunity to revisit what he's done in light of our decision in North Carolina? I think not, and I'll tell you why. The first is that North Carolina was a very unique case. It was a different panel, of course, but the panel's decision in that case, it dealt with a multiple set of different voting procedures. It dealt with a situation which the panel found was... When I say this, I'm going to give you a minute. In a minute, I'm going to ask you to tell me how it is different. But I'm just asking, should we consider sending this back to the District Court? That's what I want to know. My direct answer is no, I don't think that's necessary. That is because on this case, there was not that same factual finding in terms of the basis to conclude, which the panel did in North Carolina, that there was a racial intention to discriminate. That's not found here. In fact, the affirmative opposite was found by Judge Hudson here. And there's nothing about what was found in North Carolina, the facts upon which they premised that decision. The North Carolina District Court didn't find any racial motivation. They found 475 pages worth of facts. I understand that. And that was adjudged by this Court to have missed the point of the lawsuit. Right, and I understand that the panel in that case said that the collection of voting measures, because in North Carolina, two very compelling points that were made in North Carolina to make it different, and why this Court should not send this case back. Point one was they put great weight on the fact that North Carolina waited until after Shelby County was decided to go ahead and finally pass that law. Secondly, and even more importantly, the facts that were presented in the District Court opinion were used by this Court, a panel of this Court, to conclude that North Carolina gathered the racial data of what those voting measures that they changed would be, how they would affect minorities, and in their words, surgically targeted only those election methods that were used by minorities to deny or prevent them from the opportunity. Let me ask this, though, now. Looking at what the District Court did in this case, it found facts I'm sure you're pleased with. That's why you're the appellee. But another fact finder could perhaps look at some of those facts and decide otherwise, and then we'd be reviewing those for clearly erroneous, too, correct? Just in light of that possibility, I'm wondering the potential inferences that could be drawn from some of the historical facts and the factors, the weight given to those. Do you understand my question? Well, if you would just look at the two cases, you might say, just from a broad view, North Carolina had 475 pages the District Court did. I think I'm right on that number there, about a very, very astute and distinct and clear factual findings. I say astute, not to judge the merits, but how he'd been about it. And then we look at this, it's not that much. It's just a good opinion, perhaps, but it's not that much. But it seems to me the way our court looked at those, it doesn't necessarily indicate that this District Court decision as a matter of process is more substantial or any way more well thought out than that decision. And our court looked at that decision and said, basically, you made lots of factual findings and they seem to be right, but when you put them all together, you don't get what you think. And in light of that kind of analysis on a, I think everybody has to say, a pretty thorough opinion in North Carolina, why we wouldn't maybe consider, in light of how the court seems to look at those cases, to say either we have to look at this case in light of North Carolina, right? You're just going to argue that North Carolina doesn't change the result that you want. But somebody is going to have to look at this case in light of North Carolina, correct? Certainly. I think it's fair to say. Why should it be us instead of him? Well, what I would say is I read the panel's decision in the North Carolina case. They said we're not going to remand the case. They said we can conclude from, as you noted, the extensive fact-finding that they had on the record. And using their own findings from that record, they didn't reweigh the facts, per se. They looked at them. I know that, but that's really not the issue I'm asking. I'm asking why not remand for him to revisit it in light of the analysis and scope of review and type of review you get to these jurisdictions in light of now how the Fourth Circuit did it in North Carolina. Slightly different question. And if I understand your question, Judge Hedda, what I would say is because I think Judge Hudson did weigh the record and the evidence he had for him in keeping with even the panel's decision in North Carolina. So, in other words, if the North Carolina panel, to the extent they announced certain legal doctrines by which they would measure the photo ID requirement in that case, and again, there were many other mostly early voting. All right, then. Just other questions here, I'm sure. But tell me, how is this case different than North Carolina? Well, this case is different, as I mentioned, two very important ones. I want you to mention them, whatever you think the argument is. The panel put great weight on the North Carolina legislature's gathering of racial data as to how specific election measures would affect the minority community. And in light of that data, after they had that data, they then made and wrote the law that changed these voting measures. And what the panel said North Carolina did was to surgically target those voting mechanisms used by minorities to participate in the election, to make it more difficult, to shorten early voting, to engage in other voting practices that were more predominantly used. In this case, after you had a successful law that the governor apparently bragged about, you then come back and the results could be argued surgically impact minority voters. I mean, I'm not making that up. I think that's a fair phrasing of what the other side is saying. That is correct. That is what the other side is saying, and let me explain why that's wrong. Okay. What you had, and Mr. Spiva mentioned this, you had the 2012 law, and then you had the 2013 law. What we call SB1 was the existing law. Then you had the 1256, which was the second law. The change in those laws was made for several reasons. One reason, which Judge Hudson identifies, a very significant one, is HAVA, the Federal Help America Vote Act. And here's why that was made. You had under Federal law since 2000, or shortly after the 2000 election, the Help America Vote Act. It requires all states to obtain ID from a voter who registers by mail the first time they vote. Only certain kinds of ID qualify for that. That's listed under Federal law, and it includes photo, but also non-photo ID. So that was the HAVA law that Virginia has to comply with for Federal elections. The 2012 law in Virginia allowed the election board to mail to anyone who registered to vote a voter card that could then be used to vote in an election as identification under the 2012 law. So that card, though, isn't HAVA compliant, because the person could mail in a registration form. The election authority would obtain that form, mail out a card to that address. Somebody holding that card would then use it as ID. That's not compliant with HAVA. So because of that, Virginia election officials had two different lists. They had a list of those voters who complied with HAVA and provided a HAVA ID and could then use that state mail-out ID. Then they had those voters who hadn't, who had to first show that ID plus another form of ID. And the testimony before Judge Hudson was that that created some confusion in the administration of the election, because you had two different lists of IDs for different voters. So one of the benefits of the 2000, it wasn't the only reason, the 2013 law, was to eliminate the use of that mail-out card. But the 2013 law also increased the number of other eligible ID, including, for example, private colleges, which the testimony here showed were actually disproportionately held to a greater extent by minorities. So it actually increased those forms of ID. The 2013... In the North Carolina case in McCrory, did the state of North Carolina argue, at least as to the voter ID segment, that they were making that change for the reasons that you've given because of HAVA compliance? Did they argue that? They did not, to my knowledge. I don't believe that was one of the reasons articulated in that case. And it was certainly one that we had articulated here. And I think it's a key distinction as to why did Virginia change the law. That's the question. So in 2013, the law added more IDs, more categories of IDs, private college IDs particularly. And then it also provided for the free ID. And so there's a question that this case, that my co-counselor, opposing counsel, begs, and that is the question of whether this isn't a burden. It's a requirement. It's not the rate of possession, current possession of ID when the law is enacted. The key criteria is opportunity, which is what Section 2 says. Opportunity to participate, which is the opportunity to obtain the ID necessary to participate. That is clearly addressed by Crawford in the Supreme Court. Justice Stevens' majority decision says that this kind of requirement, that even a more onerous requirement where you must have a passport or some birth certificate or underlying document to get an ID, which Indiana had, is not a burden. It's not a substantial burden on the right to vote. Justice Scalia goes even further and explains that point in his concurrence. What was the burden testified to in this case? You had a number, maybe eight or ten, maybe ten, I think, people who testified. What was the burden on the record in this case? Well, what we had was 14 people testify, of which three were minorities. The rest were white, generally younger college students. What they testified to is that they had to wait in traffic for an hour or two to get to the registrar's office to obtain an ID. No pun. If we can make it a Federal offense to have to wait in traffic, I'm all for that. I'll say that. But it was a wait in traffic. What else was there? They had to wait in traffic. Some of them testified that, for example, there was one autistic individual who said that it was difficult for him because of his medical condition. But the testimony was that he could have voted by absentee. So he could have voted without having to obtain the ID. One fellow forgot it. Another person left their ID. Many of these people who testified had the ID. They just forgot to bring it to the poll, or they left it at home. One testified that their search and the burden was the second trip to go get it. The second trip to go get it, which even then you don't have to go home and get it and bring it back. Under Virginia's law, you can literally just fax it in, take a picture of it on your smartphone, and email it to the election board, and your vote counts. And that's, in fact, what happened. There is, as Judge Hudson found and stated six times in his opinion, no one was denied the opportunity to vote. There are, in fact, two, I think maybe three of the people, two of the people, several of them testified. They went in and sought to vote. They did not have the ID. They were given a provisional ballot. They then went home or got the ID, sent it in, and their ballot was counted. And there was one fellow who testified, well, by Friday after the election, I could have, I had the ID to cure it, but I already knew that the guy I was sporting won, so I wasn't going to send it in. What was the burden, though, in North Carolina? Here you're talking about basically no lost opportunity, at least among those who testified. I guess you could have some argument, maybe there was some testimony, maybe. I think there might have been some expert testimony that people would be discouraged and maybe not even do it in the first instance. Leaving that category aside for a minute. But here you're saying there was no lost opportunity in response to Judge Agee's question. And you say the burden was minimal, I guess is how you would describe it. It would certainly not be severe or substantial. How does that compare or contrast with North Carolina, though? I thought some of the situation there was not far removed from this. Well, in North Carolina, the panel. By the way, let me say, I get the motivation distinction. I get that. But I'm going to talk about now, let's move beyond that, at least for this question, to talk about the actual burden for people who didn't have a photo ID. Right. In North Carolina, there was not the panel decision, when you read it, it does not get into that issue because they decided it on the racial intent. So they said because it's a racial, and particularly in combination with these other election measures. I'll talk about what the evidence was in that case if you knew. I just can't remember. I read the decision below, but I can't remember. But I'm sure that was discussed. It was, and I also, Your Honor, don't recall specifically at the trial level what evidence was presented on that. But the point that I would make, too, is in terms of the actual implementation of this law. There's now been 18 elections in Virginia and the Commonwealth where this law has been. How many? Eighteen, both statewide. There's been six statewide and 14 or 12 special elections. In just the 2014 and 2015 election, just to give you an indication of how many people this are affected or burdened by this. In the 2014 election, there were 773 provisional ballots cast by somebody who showed up at the poll and said, I don't have the ID. So Virginia puts it in a separate ballot envelope. The person then can send it in. Half of those people sent in the information and cured it. In 2015. As to the people that didn't cure it, why they didn't. The only evidence we have is the testimony of the 14 people who testified in this case. And of that, several of them said, one said, well, it wasn't worth my effort after the election. Too difficult or my guy won, so I didn't, my vote wouldn't mean anything. So he didn't cure it. That's the only evidence I know of. And then I would note that in 2015, that there were only 408 provisional ballots. Now, as Judge Hudson notes, not every precinct in Virginia reported, but that's the vast majority of them. And again, the testimony of Commissioner Cortez is that half of those generally get cured. And the other half, there's certainly no prohibition or burden on preventing somebody from curing it. Again, they don't need to actually go back to the election board. They can send it in electronically by mail or whatever. I know the plaintiffs note that one fellow got his I.D. in the reply brief and didn't receive it until later on Friday. Well, that was a driver's license he was requesting, not the free photo I.D. What other distinctions are there, do you think, between Virginia and North Carolina of note? Well, I think those two particular, well, I would say there's several distinctions. And I'll tick them off very quick for you, Your Honor, if I could. I'm asking you because I have to look at that case. We have to look at that case and look at this case and see how much it controls and how much it doesn't. I would note them very quickly for you, Your Honor. I've already noted the use of the racial data. None of that was done here. The Virginia legislature didn't have it, didn't use it. There is, in this case, Judge Hudson found no evidence of discriminatory intent. This case, this law was written before Shelby County. It was written at a time when they expected it to be precleared. That was a testimony. It was, Judge Hudson found it was modeled after two other states, South Carolina and Georgia, that were both precleared. So their model for the law was one that they anticipated preclearance. This case has bipartisan support. One Democrat, one Independent supported it. What do you call that again? Bipartisan? Bipartisan, two. You also, I think, one thing you added was the justification for the change based on the Federal statute. Correct. The explanation for the HAVA statute, there was, Judge Hudson found no evidence of a partisan motive. Unlike both Texas and North Carolina, there was no departure from their normal legislative procedures here. Judge Hudson said that there was a vigorous debate that he found on the testimony about this. Also, unlike North Carolina, this case showed Governor McDonnell met with some of the people who opposed this, some of the opponents of this law, and worked with them and made some changes to it. That's a further distinction. And then the implementation of this law, which I think is also very important, Judge Hudson notes it, about how progressive Virginia has been adopting other election measures, not restricting the franchise, but expanding the franchise. By online registration, as well as I mentioned, this law added the private college ID, which is disproportionately held. Public colleges were already included, I believe. So, in other words, when you look at the list of ID that Virginia allows, it does expand it, and it's a very generous list of ID, much more than most states. Are you through with those factors, then? I am. But what it seems to me the state, some would say the state has an uphill burden because of historical facts and history, and that history, even if it's not intentional, he can win without showing intent, the other side can. If they show results, and you look at historical facts, plus the impact it has on voters, certain segments of voters, you still violate the law and lose. Quickly, how do you get around that? You're asking on the results effect? Yes, results in light of the historical facts, and all you need to say is Virginia was a Section 5 preclearance jurisdiction. We understand that, and we recognize that. I'm not saying that to be, I'm just saying that as a fact. South Carolina was, too. And we recognize that fact. How do you get around it, then, in light of that plus results, that it impacts on certain groups of voters more than others? Well, the results, we don't see that that result, okay, that there is a disparate result. We dispute that, and I didn't think, and Judge Hudson didn't. There was a very small statistical difference. But that was, when you say impact, I'm going to distinguish, Judge Head, between impact and effect, okay, because the rate of possession was what he said was small, the current possession of the ID. That's different than the impact of denying an opportunity to participate because they have the free photo ID. That's what we have to evaluate. What is your argument, and when you look at the jingle factors, and you look at a lot of those were met by Virginia, how do we then assess that plus impact equals what decision in this case? Do you understand my question? I think I understand your question. I'll try to answer it. If I look at, first, I don't think we even necessarily get to the jingles factors. If we look at the first step under Section 2, which simply says, is there this opportunity? Let's look at it. Okay. We'll look at the jingles factors. When we look at that, I note, first, that the jingles factors, of course, were written in the context of a vote dilution case, so some of them aren't directly relevant, the number of seats and things. But let's look at them. Okay. When we look at the jingles factors, I think that they direct you to the conclusion that this law was not one that was, violates any of those conditions. The historical socioeconomic conditions have no effect at all on the ability of somebody to obtain the free ID, which is, quote, the burden to vote. So the socioeconomic effect don't prevent somebody from complying with the voter ID requirement. How about getting to the registrar's office? Well, they have mobile units and they also have the ability to public transportation. I remember the governor saying on TV, if you can't get an ID card, call us. Here's my number and we will come to you. Do you have an outreach program like that? They do, and there was extensive testimony. And it's interesting, too, Your Honor, because the outreach program is actually being, under the current administration, run by folks who may have originally been opposed to it. And they've done an amazing job of trying to make sure that no Virginian is denied an opportunity. I don't want to push you past your time. That's a red light there. You probably have two tickets. One more question. The opposing counsel didn't address this. He may or may not. But as I'm remembering Judge Hudson's opinion, a distinction, at least from the Fifth Circuit case recently, was the district court's findings with respect to the validity of at least one of the experts' research methodology, which he found to be defective in certain respects. Is there anything you want to tell us about that and why that makes a difference? And is there any distinction between this case in terms of the expert methodology and what there was in the North Carolina case? What I would look at is Judge Hudson, in terms of the methodology, the one that was probably the most disputed was in this case, Judge Hudson discussed Dr. Roden's testimony. And Dr. Roden was the one who provided the testimony in terms of matching or speculating as to the number of people who would not possess currently the ID that was required to vote. The flaw that Judge Hudson found in Dr. Roden's methodology was that it did not he used a very small subset of the data of potential IDs. He didn't include all the military IDs, all the student IDs, all the government-issued IDs, which in Virginia, of course, is important with the government employees. So not including those effectively or reliably in his analysis meant that he grossly overstated the calculation of those who didn't possess it and the racial composition of that. That was the criticism that Judge Hudson had of him. And I think that was a distinction as well between some of the other cases, both Texas and North Carolina. Thank you. Thank you, Mr. Hearn. Mr. Spiva? Do you pronounce it Spiva or Spiva? Spiva is correct, Your Honor. Thank you very much. You're one of the few people who actually does it right the first time. Is that Spiva or Spiva? I'll answer anything. So, Your Honor, let me just start with that last point. Judge Hudson, in fact, did not find that Professor Roden's analysis was flawed in the way that my distinguished colleague said. What he did say was that he hadn't taken into account non-citizens and, in fact, people who were former felons, which is actually clearly erroneous, because Dr. Roden's analysis is of registered voters. So it clearly only takes into account people who were qualified to vote. Yeah, the felons and former felons and non-citizens are not included within his analysis, because he starts his analysis from the state's voter data file. And I think that was just some confusion with respect to that. The defendants did make this. I'm sorry, Your Honor. What about military and government personnel and their defendants? Right, Your Honor, and the defendants did make this criticism, even though the Department actually calculated the number of people who lacked a qualifying ID in a similar way. In fact, Dr. Roden went a step further and tried to estimate that military and student IDs, which is something that the DOE had not done. But the point there, and Dr. Roden made this point, and it really is unrebutted. The point is he was measuring the difference in ID holdership between minorities on the one hand and whites and between young people and not young people on the other. And so the point that he made, and this is in the record and it's really unrebutted, I don't think even their expert, Dr. Thornton, really has an answer to this, is that the only way that could make a difference is if, for instance, military people who don't live on a military base, because those people are counted for in Dr. Roden's analysis, if they somehow are overwhelmingly African American or Latino and they don't have a driver's license, the people living off the base. And first of all, that's pretty implausible, and he had to make assumptions to get his results to change in any meaningful way. He had to make wildly implausible assumptions that that group was 90 percent African American, which just doesn't make any sense. And there's other evidence, other studies that suggest the types of IDs that couldn't be precisely measured, like passports, are much more likely to be held by whites. And so if anything, his analysis undercounts the disparity. And he did it with three different rigorous methodologies that have been accepted in the courts for years, ecological inference, homogeneous census blocks, and an individual level analysis. Each way he measured it, he found a very significant difference in terms of disputed. Judge Hudson actually found that there was a difference. I think he erred as he characterized it as a slight difference, which I think is both legal and a factual error, because if you just look at the percentages in his analysis, they're actually quite substantial, as much as twice as much. And it's wrong as a legal matter, I think, because the question is not the magnitude of the difference, but the fact that there is a difference. Do you think that looking at how the Fourth Circuit categorized the North Carolina actions, do you think that what we have in this case is as egregious? I know you think it's intentional and it's wrong, so there's just a claim that it's wrong, it's wrong. But do you think it's as egregious as North Carolina was as seen by this court? In terms of burden, Your Honor? In terms of voting rights violation. Yes, Your Honor. I think the sheriff's... And the situation. Do you think the background situation, motivation, the results, the efforts by the General Assembly in North Carolina, if it's called the General Assembly, that what Virginia did in those regards in the case in chief in the totality of circumstances was just as egregious? Yes, Your Honor. I mean... Why so? Well, let me answer in a couple of ways. Again, putting intent aside for a moment, I have to disagree with my colleague's characterization of the burden here. It wasn't just that somebody had to sit in traffic. I mean, the fact of the matter is that we have lots of testimony in the record of people who would have to travel for hours or did travel for hours to get a free ID or to get to a DMV, and that that impacts people who tend not to have cars. And that's why it's such a problem that the district court didn't really analyze the... Do you think the evidence of intentional discrimination in Virginia is as strong as it was in North Carolina? It shares a lot of the same characteristics, Your Honor. First of all, the existence of polarized voting. In some ways, it's stronger here because... But that doesn't go to the intent of the legislature. That goes to the fact. Right. Well, in this legislature, the same legislature that passed the photo ID law has also been found to have racially gerrymandered its congressional districts. And one factor you have here that you don't have in North Carolina, as strong as that evidence is... Well, you think this is worse than North Carolina? Well, I think there is some evidence that this case shares with North Carolina, and then there's some that's different. And the part that's different... Is that different or worse? Well, it's just as bad. I'll put it that way. Here, you have a General Assembly that passes a strict non-photo ID law in 2012. The Republican governor says it's a big success amongst... And his staff members circulate emails saying he doesn't think it should be changed. I raised that point myself. Right. Right. And without any reason, Your Honor, you can search the legislative record in vain, really. And all the stuff about HAVA is all after the fact, and it doesn't add up. You don't usually get a legislative history in Virginia. Right. Well, that's right. But there were meetings. There were committee hearings. There were people that came and testified about the types of information that the legislature considered. We did get some internal records. I shouldn't say obviously, but the legislature, of course, invoked its legislative privilege. So we don't have anything on the other side here. We don't have statements by the proponents explaining why is it. Right. You're almost never going to get that on. I mean, they just don't do it in Virginia. It doesn't matter what the bill says. Sure. But there's nothing, Your Honor, is what I'm saying, even if there's no... But I just want to be sure, your argument is that factually, when you look at the facts of what the timing on Shelby County, the timing on what they did to getting the data, that the motivation of Virginia was as bad, if not worse, than North Carolina. Yes. I think it's as bad, Your Honor, because you also had lots of evidence in front of the legislature, people testifying that this was going to have a disparate impact. You have e-mails that talk about a voter I.D. work plan and that talk about the Obama coalition that, you know, that caused Virginia to go for Obama. And the only relationship between those two things is that voter I.D. tends to suppress the minority and Democratic and young vote. And there's really nothing, Your Honor, that explains why this change in 10 months. All right. Thank you, Mr. Spiva. We'll come down and greet counsel and adjourn for the day. This honorable court stands adjourned until tomorrow morning.
judges: Paul V. Niemeyer, Dennis W. Shedd, G. Steven Agee